UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LARRY MANNING,

                Plaintiff,               CIVIL ACTION NO. 12-14950

          v.                    DISTRICT JUDGE GERALD E. ROSEN

                              MAGISTRATE JUDGE MARK A. RANDON

COMMISSIONER OF
SOCIAL SECURITY,

                Defendant.
_____/

## REPORT AND RECOMMENDATION
## ON CROSS MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 11, 12)

Plaintiff Larry Manning challenges the Commissioner of Social Security's ("the Commissioner") final denial of his benefits application. Cross motions for summary judgment are pending (Dkt. Nos. 11, 12); Plaintiff also filed a reply (Dkt. No. 13). Chief Judge Gerald E. Rosen referred the motions to this Magistrate Judge for a Report and Recommendation (Dkt. No. 3).

## I.      RECOMMENDATION

Because the Administrative Law Judge ("ALJ") erred in evaluating the opinion of Plaintiff's treating psychiatrist, this Magistrate Judge **RECOMMENDS** that Plaintiff's motion for summary judgment be **GRANTED**, Defendant's motion for summary judgment be **DENIED**, and the case be **REMANDED** to the Commissioner for further proceedings consistent with this Report and Recommendation.

II.      **DISCUSSION**

### A. *Framework for Disability Determinations*

Under the Social Security Act (the "Act"), Disability Insurance Benefits and Supplemental Security Income are available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability," in relevant part, as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*See* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that the claimant is disabled, the burden transfers to the [Commissioner]." *Preslar v. Sec'y of HHS*, 14 F.3d 1107, 1110 (6th Cir. 1994).

###### *B.  Standard of Review*

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited such that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses") (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted); *see also Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted) (explaining that if the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion"); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a

zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, this Court is limited to an examination of the record and must consider that record as a whole. *See Bass v. McMahon*, 499 F.3d 506, 512-13 (6th Cir. 2007); *Wyatt v. Sec'y of HHS*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston*, 245 F.3d at 535. There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party") (internal quotation marks omitted). Further, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass*, 499 F.3d at 509; *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant").

## III.   REPORT

### A.  *Administrative Proceedings*

Plaintiff applied for disability insurance benefits on October 22, 2008, alleging a disability onset date of January 1, 2004 (Tr. 11-12);[1] the Commissioner denied the application.

---

[1] There is disagreement about the proper dates surrounding Plaintiff's claim. The ALJ found that Plaintiff applied for disability insurance benefits on October 22, 2008, alleging a disability onset date of January 1, 2004 (Tr. 11-12, 180); Plaintiff points to an application for disability benefits dated January 5, 2009, alleging disability onset on January 1, 2004 (Tr. 159-165; 168-174). Accordingly, Plaintiff asserts that his claim concerns an application for SSI benefits with an alleged onset date reflective of the date he applied: January 5, 2009 (Dkt. No. 11 at p. 14). Counsel sought to amend his alleged onset date to January of 2009 at the administrative hearing (Tr. 31). The ALJ makes no mention of this in his decision, and considered the question

Plaintiff appeared with counsel for a hearing before ALJ Jerome B. Blum, who considered the case *de novo* (Tr. 11). In a written decision, ALJ Blum found Plaintiff was not disabled since October 22, 2008, the date Plaintiff filed his application (Tr. 11-24). Plaintiff requested an Appeals Council review (Tr. 7). On October 2, 2012, the ALJ's findings became the Commissioner's final administrative decision when the Appeals Council declined further review (Tr. 1-6).

### B.  ALJ Findings

Plaintiff was 30 years old on the date his application was filed; he has a limited education (did not complete middle school), past relevant work in security and as a fast food cook (Tr. 19). The ALJ applied the five-step disability analysis to Plaintiff's claim and found at step one that he had not engaged in substantial gainful activity since his application date in 2008 (Tr. 13).

At step two, the ALJ found that Plaintiff had the following "severe" impairments: HIV, gout, and depression (*Id*.).

At step three, the ALJ found no evidence that Plaintiff's impairments met or medically equaled one of the listings in the regulations (Tr. 14).

Between steps three and four, the ALJ found Plaintiff had the Residual Functional Capacity ("RFC") to perform unskilled sedentary work (*Id*.).[2]

---

of disability based on Plaintiff's October of 2008 application (Tr. 11-12). Any confusion should be explicitly clarified on remand.

[2] Sedentary work involves:

lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

At step four, the ALJ found that Plaintiff could not perform his past relevant work (Tr. 19).

At step five, the ALJ found Plaintiff was not disabled, because he could perform a significant number of jobs in the national economy (Tr. 19).

### C. Administrative Record

#### 1. Plaintiff's Hearing Testimony and Statements[3]

Plaintiff last worked in 2008 as a laser operator; he was hired through a temp agency and fired within a month (Tr. 36). On his last day, the police were called because he was "in an uproar," and his employer wanted him off of the property (*Id.*). Plaintiff previously worked as a security guard (*Id.*). He was fired from that job after two to three years because he was unable to perform his duties – he "didn't have the energy to do it" (Tr. 36-37).

Plaintiff says he cannot work because of his depression and the irritability and fatigue he experiences as side effects of his medications (Tr. 37). He seeks treatment at a psychiatric clinic for his condition (Tr. 39). Plaintiff takes Risperidone[4] and another medication at night (Tr. 39-

---

20 C.F.R. § 404.1567(a).

[3] Plaintiff's testimony before the ALJ reflects his subjective view of his medical condition, abilities, and limitations; it is not a factual finding of the ALJ or this Magistrate Judge.

[4] "Risperidone is used to treat the symptoms of psychotic disorders, such as schizophrenia, mania or bipolar disorder, or irritability associated with autistic disorder." *See* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0012012/?report=details (last accessed January 26, 2014).

40).[5] Plaintiff was hospitalized in August of 2009, and remained so for two to three weeks (Tr.

40-41). When asked whether he knew why he was admitted, Plaintiff responded:

> A: They just admitted me, and when they admitted me they diagnosed me with different things I didn't even know I had, and sent me on with all these pills and told me to keep up another appointment, and I didn't do so . . . because of lack of – I didn't have no insurance

(Tr. 41).

Plaintiff has HIV; he was diagnosed in 2006 and takes Atripla[6] (Tr. 37). His HIV and

associated medications cause him forgetfulness; lightheadedness; trouble breathing; difficulty

standing for too long; inability to lift weight regularly; fatigue – he cannot move at all; and,

frequent bowel movements (once or twice every hour) (Tr. 37-38). Plaintiff recently attained

new health insurance; before that, he sought HIV treatment at a free clinic (Tr. 38-39).

Plaintiff also has gout (Tr. 43). It affects his foot, toes, and joints; his symptoms reappear

every three weeks and last up to a week and a half (Tr. 43-44).

Plaintiff has difficulty concentrating and sleeping – he "wake[s] up in a cold sweat like

somebody is always trying to do [him] harm [], and [he] can't sleep that long"; trouble getting

along with people "all the time" because of mood swings; anger problems; and, daily visual and

auditory hallucinations (Tr. 41-43). He also has frequent anxiety attacks: he gets anxious and

paranoid when people he does not know are in his space (Tr. 45).

Plaintiff currently lives in a house, but has been living in and out of shelters (Tr. 34-35).

Between 9:00 a.m. and 5:00 p.m., he spends approximately five hours lying down; he gets up to

---

[5] When the ALJ asked if he also took Citalopram, Plaintiff was unsure (Tr. 39).

[6] Atripla treats HIV infection. It does not cure HIV or AID but may slow the disease's progression. *See* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0010080/?report=details (last accessed January 26, 2014).

use the bathroom and take care of his personal needs (Tr. 39). Plaintiff can sit for two and a half

hours before he has to use the bathroom; stand for seven or eight minutes before he gets tired (he

loses his breath, his legs feel weak, and he feels on the verge of fainting); walk one block before

he feels tired and lightheaded; and, occasionally lift up to 20 pounds (Tr. 44-45).

## 2.        Relevant Medical Evidence[7]

On March 26, 2009, Plaintiff presented to Nick Boneff, Ph.D., for a consultative

examination (Tr. 310-13).[8] Plaintiff reported that he was unable to sustain employment because

of chronic pain, gout and weakness secondary to his HIV status; he was experiencing symptoms

of depression including lethargy, loss of motivation and interest in socializing, and anxiety

attacks with mild feelings of suspiciousness and paranoia (Tr. 310). Plaintiff denied disturbance

of thought and suicidal ideation, and had never received inpatient psychiatric care (*Id*.). He

required no help with his basic ADL's, grooming, or physical activities; could do light household

chores, but no strenuous activity; and, his sleep was disturbed by foot and back pain (Tr. 310-

11). Upon examination, Plaintiff had dull affect; mildly depressed mood; no symptoms of major

depression or suicidal ideation, or anxiety interfering with daily functioning; and, logical, fluid,

and organized stream of mental activity (Tr. 311-12). Dr. Boneff concluded that Plaintiff did not

evidence any significant impairments of cognitive functioning, and his short and remote memory

was intact; he opined that there was no clinical data or history to suggest Plaintiff would have

problems doing simple routine, sedentary work if he continues with the appropriate medical

---

[7] The medical evidence discussed is limited to that related to the claim on which this Magistrate Judge finds reversible error: primarily, record evidence from NHCH and the consultative examination of Nick Boneff, Ph.D.

[8] The evaluation was also signed by Julia A Czarnecki, M.A., LLP (Tr. 313)

attention to his various conditions (Tr. 312-13). Dr. Boneff diagnosed depression secondary to

medical condition and poly-substance abuse disorder in early partial remission; he assigned a

GAF of 50 (based on medical condition) (Tr. 313).[9]

On February 16, 2011, Plaintiff began treatment at North Central Health Center

("NCHC") after he was referred as part of a court order; he presented for a Bio-Psychosocial

History and Assessment (Tr. 354). Plaintiff reported that he had been diagnosed with bipolar

disorder and was on medication in the past (*Id.*). He was unable to sleep; had attempted suicide

most recently in 2010 (he had attempted to hang himself); thought of hurting others; became

very frustrated; had been in several physical altercations; noticed a change in personality at age

22; was hearing voices, including that of his imaginary friend (who had been around since

childhood, and would not go away); thought he might be experiencing visual hallucinations;

experienced rapid mood changes; was impatient; had poor concentration and focus (he used to

love reading, but could no longer concentrate); and, was homeless and unable to maintain

employment (Tr. 354, 358). Treatment notes diagnosed co-occurring mental illness and alcohol

---

[9] The GAF score is:

a subjective determination that represents the clinician's judgment of the individual's overall level of functioning. It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). . . . A GAF of 41 to 50 means that the patient has serious symptoms . . . OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). A GAF rating of 51 to 60 signals the existence of moderate difficulty in social or occupational functioning.

*White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 276 (6th Cir. 2009). "A GAF score may help an ALJ assess mental RFC, but it is not raw medical data. Rather, it allows a mental health professional to turn medical signs and symptoms into a general assessment, understandable by a lay person, of an individual's mental functioning." *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. App'x. 496, 502 n. 7 (6th Cir. 2006).

abuse (Tr. 354). Examination revealed that Plaintiff had depressed mood; intact short- and long-term memory; immature judgment; ideation of self-harm; appropriate behavior; constricted affect; fair insight; logical thought process; and, was fully orientated (Tr. 358). Nanci Beard, M.A., LLP ("LLP Beard") electronically signed the evaluation (Tr. 362).

On March 1, 2011, Plaintiff presented for an NCHC Nursing Assessment; Brenda Adams, R.N. ("Nurse Adams"), electronically signed the treatment notes (Tr. 373-82). Mental status exam revealed angry and depressed mood; appropriate behavior; flat affect; evasive/guarded attitude; logical, coherent thought processes; moderately impaired short-term memory and mildly impaired long-term memory; fair judgment and insight; no risk of self-harm; and, ideation, plan and intent with respect to a risk of violence (Tr. 375). Plaintiff reported trouble falling asleep; restless and interrupted sleep; nightmares; auditory hallucinations; no visual hallucinations (but reported seeing his uncle who had committed suicide); and, irritability (Tr. 376). He stated "I did" when asked whether he had thoughts of hurting someone else; and, described several suicide attempts involving pills, hanging himself, and shooting himself in the abdomen  (*Id.*). He was underweight, tired easily, had a fair appetite, and had lost 25 to 30 pounds (Tr. 376).

On March 4, 2011, Plaintiff presented for a medication review and psychiatric evaluation; he was still homeless (Tr. 383-92). Medications were not addressing Plaintiff's symptoms; decompensation was noted with respect to his engagement; concentration; neatness/hygiene; attention to detail; problem-solving; and, affect (Tr. 384-85). Plaintiff reported that he was on two court-ordered probations; requested a brain MRI and stated "I know something is not right"; had migraine headaches; felt paranoid and had been self-isolating since his HIV diagnosis in 2006; felt tired, sad, depressed, angry, and upset; denied suicidal or homicidal thoughts, intent or

-10-

plan; had decreased sleep, racing thoughts; recently fought with someone, but was unwilling to talk about it; felt guilty and hopeless; and, missed his daughter (Tr. 385). Plaintiff was highly anxious – he experienced a pounding heart that would last a few minutes, and had nightmares of others chasing to kill him (*Id*.). He woke up in cold sweats; continued to talk to an imaginary friend he had since age 7; reported hearing voices, non-command, since he was a child; and, denied any other hallucinations (*Id*.). Mental status examination revealed poorly groomed appearance; angry, anxious, and depressed mood; appropriate, constricted affect; evasive/guarded, withdrawn attitude; logical, coherent thought with delusions and auditory hallucinations; monotone, slow/delayed, and soft speech; no risk of violence; psychomotor retardation; and, no abnormal involuntary movements (Tr. 385-86). Plaintiff was diagnosed with major depressive disorder, recurrent, severe with psychotic features; psychotic disorder NOS; and, assigned a GAF of 50 (Tr. 388). Nitin Rajhans, M.D., concluded that Plaintiff exhibited a serious chronic condition that would require continuous treatment; and, multiple conditions/illnesses that generally indicate high complexity and require continuous integrated treatments (Tr. 388). He was prescribed Celexa[10] and Risperdal (Tr. 385).

On March 11, 2011 Plaintiff's treatment team – Dr. Rajhans, LLP Beard, and Nurse Adams – developed a person-centered treatment plan; Plaintiff's diagnoses were listed as major depressive disorder, recurrent, severe with psychotic features and psychotic disorder NOS (Tr. 345-46, 398, 400). That same date, Plaintiff was also scheduled to see a neurologist; he was experiencing severe headaches (Tr. 401).

---

[10] "[Celexa] is used to treat depression. It belongs to a group of medicines known as selective serotonin reuptake inhibitors (SSRIs). These medicines are thought to work by increasing the activity of a chemical called serotonin in the brain." *See* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0009639/?report=details (last accessed January 26, 2014).

On March 18, 2011, Plaintiff presented for medication review (Tr. 402). He appeared sad and somewhat agitated; had been in a physical confrontation two weeks prior that he continued to refuse to talk about; reported that his prescriptions were not yet effective; and, still spoke with his imaginary friend (*Id.*). Decompensation was noted in concentration; neatness/hygiene; attention to detail; problem solving; and, affect (Tr. 404-05). Plaintiff complained of headaches and back pain; he felt sad, depressed, angry, and upset; he reported feeling paranoid, and attributed it, at times, to marijuana usage (Tr. 405). His medications were increased, and he was strongly advised to refrain from using drugs and follow up with a primary care physician (*Id.*). LLP Beard electronically signed the treatment notes (Tr. 402).

On April 22, 2011, Dr. Rajhans completed a medical questionnaire (Tr. 407). He had been treating Plaintiff since March 4, 2011; he diagnosed major depressive disorder, recurrent, severe, with psychotic features, and listed depression, auditory hallucinations, and paranoid delusions (*Id.*). Dr. Rajhans listed Plaintiff's functional limitations: unable to manage in public places; unable to follow directions or work in proximity of others; quick to anger; and, racing thoughts (Tr. 407). Dr. Rajhans anticipated continued pharmacology and therapy, and listed Plaintiff's prognosis as chronic and pervasive (Tr. 408). He opined that Plaintiff was not capable of performing a full-time job on a sustained basis because he was unable to be around people, and was distracted by external stimuli (*Id.*). Dr. Rajhans also completed a mental RFC assessment: he opined that Plaintiff was moderately limited in the ability to remember locations and work-like procedures; understand and remember one or two-step instructions; understand, remember, and carry out detailed instructions; make simple work-related decisions; ask simple questions or request assistance; be aware of normal hazards and take appropriate precautions; and, travel in unfamiliar places or use public transportation (Tr. 410). He opined that Plaintiff

-12-

had marked limitations in the ability to carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual with customary tolerances; sustain an ordinary routine without supervision; work in coordination with or proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; adhere to basic standards of neatness and cleanliness; respond appropriately to change in the work setting; and, set realistic goals or make plans independently of others (Tr. 410-11). Dr. Rajhans indicated that last saw Plaintiff on April 15, 2011 (Tr. 411).

### D.  Plaintiff's Claims of Error

### 1.  The ALJ's Assessment of Dr. Rajhans' Opinion

Plaintiff first argues that the ALJ erred by failing to provide good reasons for discounting the opinion and assessments of his treating psychiatrist, Dr. Rajhans.

Preliminarily, Defendant responds that Dr. Rajhans is not a treating source under the pertinent regulations, which state:

> Treating source means your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you. Generally, we will consider that you have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with acceptable medical practice for the type of treatment and/or evaluation required for your medical condition(s). We may consider an acceptable medical source who has treated or evaluated you only a few times or only after long

intervals (e.g., twice a year) to be your treating source if the nature and frequency of the treatment or evaluation is typical for your condition(s).

20 C.F.R. § 404.1502. "The question is whether [Dr. Rajhans] had the ongoing relationship with [Plaintiff] to qualify as a treating physician *at the time he rendered his opinion." Kornecky,* 167 F. A'ppx at 506 (emphasis in original).

Defendant points to *Daniels v. Commissioner of Social Security* in support, emphasizing that the Sixth Circuit found the treating source rule inapplicable where the physician had only seen the claimant twice in one month. 152 F. App'x 485, 491 (6th Cir. 2005). Although the number of visits the claimant made to the physician was relevant to the Court's holding, more important – and what Defendant fails to mention – is, consistent with the text of the regulations, the Sixth Circuit focused on the amount of visits relative to the condition for which the claimant sought treatment: "[a] physician who has treated a patient only a few times may be considered a treating source *if that frequency of visits is appropriate for the claimant's medical condition*."[11] *Id.* (citing 20 C.F.R. § 404.1502) (emphasis added). Aside from pointing to the number of visits Plaintiff made to Dr. Rajhans, Defendant does not demonstrate how the facts at hand are analogous.

Instead, "there is evidence that Dr. [Rajhans] was responsible for monitoring [Plaintiff]'s progress in a way that strongly suggests the 'ongoing treatment relationship' that the regulations

---

[11] The Court continued: "Dr. Pinson saw [the claimant] on two occasions, November 13, 2001, and November 16, 2001. [The claimant], however, sought treatment for his back pain on many more occasions than these two visits, including six visits to the emergency room and several other visits to King's Daughters' Outreach Center. [The claimant]'s two visits to Dr. Pinson within the span of a few days is not a frequency consistent with the treatment of back pain, as evidenced by the fact that he received treatment from other sources on many other occasions." *Daniels v. Comm'r of Soc. Sec.,* 152 F. App'x at 491. As Plaintiff points out, the facts at hand are no more similar to these aspects of the Court's analysis (Dkt. No. 13 at p. 2 (CM/ECF)).

-14-

and case law describe as deserving of deference." *Kerkau v. Comm'r of Soc. Sec.*, 12-11520, 2013 WL 2947472, at *9 (E.D. Mich. June 14, 2013) (the physician saw the claimant two times in less than a month, demonstrating that the physician was following claimant's condition closely) (citing 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2))). The record shows that Plaintiff's treatment at NCHC – where Plaintiff treated with Dr. Rajhans, first on March 4, 2011 – began in February of 2011 as the result of a court order that would likely require an extended period of clinic visits for compliance (Tr. 354, Tr. 383-92); Dr. Rajhans saw Plaintiff at least twice in March of 2011 and once in April before rendering his opinion;[12] and, associated mental health professionals at NCHC saw Plaintiff within the same time period as part of an ongoing, team effort to coordinate Plaintiff's treatment (Tr. 345-46, 398, 400). Therefore, Dr. Rajhans' assessment of Plaintiff's prognosis was derived from more than the two March 2011 evaluations Defendant emphasizes. Nevertheless, Defendant's attempt to minimize this treatment relationship is of no consequence because, as discussed below, the ALJ failed to discuss these visits or any other details of Dr. Rajhans' treatment with Plaintiff. The ALJ referred to Dr. Rajhans as Plaintiff's "treating psychiatrist," and this Court is not persuaded that it should find otherwise.

The Sixth Circuit recently clarified the proper approach to evaluating the opinions of treating sources:

> [u]nder the pertinent regulations, more weight is generally given to the opinion of a treating physician.  As long as the treating physician's opinion regarding the nature and severity of the claimant's impairment is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence, it will be given controlling weight.

---

[12] Though, as Defendant notes, records from this visit are absent from the record.

*Johnson v. Comm'r of Soc. Sec.*, __ F. App'x __, 2013 WL 5613535, at *7 (6th Cir. Oct. 15, 2013); *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) reh'g denied (May 2, 2013). With respect to Dr. Rajhans' opinion, the ALJ stated the following:

> Dr. Rajhans, the treating psychiatrist, stated that the claimant had major depressive disorder, with an onset in childhood. This indicates that the claimant worked and functioned with his symptoms for several years. Dr. Rajhans stated that the claimant is unable to follow directions, experienced racing thoughts, and was quick to anger. Dr. Rajhans opined that the claimant had moderate to marked limitations in several domains of functionality. However, the office records from [NCHC] do not corroborate these conclusions, nor are the opinions supported by the other medical evidence of record. Thus, these assessments are given little weight.

(Tr. 18). Plaintiff does not argue that Dr. Rahjans' opinion was entitled to controlling weight. Instead, he says the ALJ neglected to comply with the procedural element of the treating source rule:

> If the ALJ chooses not to give the treating physician's opinion controlling weight, he or she must determine what weight to give it by looking at various factors, including the length of the treatment relationship and the frequency of examination; the nature and extent of the treatment relationship; the supportability of the opinion; its consistency with the record as a whole; the specialization of the physician or doctor rendering the opinion; and other factors that support or contradict the opinion.

*Johnson*, 2013 WL 5613535, at *7 (internal citations and quotations omitted).

> The Commissioner is [then] required to provide good reasons for discounting the weight given to a treating-source opinion[,] . . . supported by the evidence in the case record[] and . . . sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight. This procedural requirement ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule.

*Gayheart*, 710 F.3d at 376. To be sure, even if this Court were to find that Dr. Rahjans was not a treating source, the ALJ was still required to provide a sufficient explanation for his determination. *See, e.g., Beck v. Comm'r of Soc. Sec.*, No. 12–CV–11067, 2012 WL 7827842 (E.D. Mich. Dec. 26, 2012) (recommending remand where the ALJ did not adequately explain how he accounted for an examining physician's opinion), *report and recommendation adopted,*

-16-

2013 WL 1317013 (E.D. Mich. Mar. 29, 2013); *Lowery v. Comm'r of Soc. Sec.*, 55 F. App'x 333, 339 (6th Cir. 2003) ("Moreover, an ALJ may not select and discuss only that evidence that favors his ultimate conclusion, but must articulate, at some minimum level, his analysis of the evidence to allow the appellate court to trace the path of his reasoning." (internal quotations omitted)).

In effect, in concluding – without elaboration – that "the office records from [NCHC] d[id] not corroborate [Dr. Rajhans'] conclusions, nor [were Dr. Rajhans'] opinions supported by the other medical evidence of record," the ALJ addressed only the first component of the treating source analysis. Even if an opinion is not well supported or inconsistent with the record – and thus not entitled to controlling weight – it must be *expressly* considered alongside the factors in 20 C.F.R. § 404.1527(c) and § 416.927(c).The ALJ only passingly addressed Dr. Rajhans' opinion's supportability and consistency with the record as a whole, and failed to mention any of the remaining factors: the length of the treatment relationship and frequency of examination; the nature and extent of the treatment relationship; Dr. Rajhans' specialty; and, any other factors "which tend to support or contradict the opinion." 20 C.F.R. §§ 404.1527(c), 416.927(c).

Granted, a portion of the records from NCHC list specific directives for Plaintiff's treatment plan (specifically, the discreet therapy goals related to seven different problem areas), with only sparse notations specific to Plaintiff's presentation or reported symptoms (Tr. 343, 359-62). But this format alone does not create inconsistences; to the extent that the ALJ interpreted it as a lack of corroboration for Dr. Rajhans' findings, it is not enough to diminish Dr. Rajhans' findings.[13]

---

[13] Whether the format leaves the ALJ unsure or in need of clarification, however, is a different question. If, on remand, the ALJ realizes such a dilemma, the regulations provide the proper remedy. *See* 20 C.F.R. §§ 404.1527(c)(3), 416.92(c)(3).

Meanwhile, it remains unclear which components of Dr. Rajhans' assessment make up the "little weight" credited by the ALJ. Considering the ALJ's finding that Plaintiff had moderate limitations in concentration, persistence, or pace, it would have been helpful, at the very least, to know – of these "several domains of functionality" – which proved most integrative in this finding.[14] It also appears that the ALJ's failure to credit Dr. Rajhans' assessment carried over to his consideration of the NCHC treatment notes in general: the only mention that Plaintiff's treatment at NCHC gets is, immediately prior to the ALJ's statements regarding Dr. Rajhans' opinion, the ALJ's curt acknowledgment that "[r]ecords do reflect treatment for depression at [NCHC], beginning March 2011, including symptoms of poor sleep, low energy, and crying

---

[14] In making findings related to Plaintiff's non-exertional limitations, including concentration, persistence, or pace, the ALJ stated the following:

> In activities of daily living, the claimant has mild restriction. The claimant has no problem with his personal care needs, and even cares for his young daughter, a task which is presumably physically and emotionally demanding. The claimant is capable of preparing meals, using public transportation, and managing finances.

> In social functioning, the claimant has mild difficulties. The claimant's mother reports that the claimant enjoys playing cards and socializing with family members, although he does not like crowds.

> With regard to concentration, persistence or pace, the claimant has moderate difficulties. The claimant reports difficulty with his concentration and memory; however, he cares for a young daughter and manages finances.

(Tr. 14-15). The ALJ includes no citation to the record. Meanwhile, the information discussed as support for the ALJ's findings here appears to be derived almost entirely from Plaintiff and his mother's separate February 2009 function reports (Tr. 236-51). For example, treatment notes from 2011 indicate that Plaintiff missed his daughter, suggesting he no longer cared for her (Tr. 385). This Magistrate Judge does not ask the ALJ to find any less relevant information from 2009; it simply gives pause that such disparities – particularly one relied upon at multiple points in the ALJ's analysis and easily apparent upon reviewing the record – are in no way reconciled by the ALJ (Tr. 14-15, 18). On remand, the ALJ should ensure that an RFC that limits Plaintiff to unskilled work is sufficient to account for Plaintiff's non-exertional limitations.

-18-

spells" (Tr. 18). To the extent that the ALJ perceived a lack of corroboration between records

from NCHC and the findings of Dr. Rajhans, it does not justify the ALJ's disposal of this portion

of the record.

Plaintiff also argues that the ALJ erred by relying primarily on the consultative

examination of Dr. Boneff to discount Dr. Rajhans' opinion.[15] He claims that the ALJ selectively

relied upon only those portions of Dr. Boneff's report that supported the ALJ's RFC: "in

discussing Dr. Boneff's report, the ALJ erroneously states that Plaintiff had a mildly depressed

mood but with no symptoms of depression" (Dkt. No. 11 at pp. 11-12). This is not so: the ALJ

stated that Plaintiff had "no symptoms of *major* depression, suicidal ideation, or anxiety

interfering with daily functioning" (Tr. 18) (emphasis added). This is the precise language

utilized by Dr. Boneff. Plaintiff also takes issue with the ALJ's failure to mention that Dr. Boneff

diagnosed him with depression (secondary to medical condition) and assigned a GAF of 50 (Dkt.

No. 13 at pp. 4-5). But, contesting the portions of Dr. Boneff's findings that the ALJ did or did

not explicitly mention does not change his conclusions about Plaintiff's functional capabilities;

Plaintiff does not claim the ALJ misrepresented or neglected to mention Dr. Boneff's

conclusions about his functional capabilities.

Regardless, Plaintiff's concern about the ALJ's treatment of Dr. Boneff – a one-time

consultative examiner – as compared with his treatment of Dr. Rajhans' opinion only

underscores the need for the ALJ to explain his reasons for not fully crediting Dr. Rajhans'

opinion: side by side, Dr. Boneff's 2009 prognosis and functional assessment stands in stark

contrast to Dr. Rajhans' in 2011 – the ALJ's explanation fails to reconcile this disparity.

---

[15] Although the ALJ did not state what weight he gave to Dr. Boneff's opinion, his RFC
appears to adopt entirely Dr. Boneff's conclusion that "there was nothing in the claimant's
clinical data or history to suggest problems with simple, routine, sedentary work" (Tr. 18, citing
Tr. 312-13).

An ALJ does not need to discuss every factor listed in the regulations, particularly those factors not especially relevant to the unique set of circumstances that make up the claim before him. *Francis v. Comm'r Soc. Sec. Admin.*, 414 F. App'x 802, 805 (6th Cir. 2011) ("the treating-source rule is not a procrustean bed, requiring an arbitrary conformity at all times" (internal citations and quotations omitted)); *see also Kornecky*, 167 F. App'x at 507 ("it is well settled that[] [a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party" (internal quotations omitted). But, "it is not enough to dismiss a treating physician's opinion as 'incompatible' with other evidence of record; there must be some effort to identify the specific discrepancies and to explain why it is the treating physician's conclusion that gets the short end of the stick." *Friend v. Comm'r of Soc. Sec.,* 375 F. App'x 543, 552 (6th Cir. 2010); *see also Kerkau v. Comm'r of Soc. Sec.*, 2013 WL 2947472, *9 (ALJ's explanation that he "considered the medical statement from [the treating source], and accords the opinion limited weight as it lacks support and is inconsistent with the records provided" was insufficient to comply with procedural requirement of treating source rule (internal quotations omitted)).

As such, Plaintiff is correct: the ALJ's lack of elaboration precludes meaningful review. It is not clear that the ALJ's assignment of "little weight" to Dr. Rajhans' opinion is supported by substantial evidence, derived from comprehensive consideration of the record as a whole.

## 2.      Plaintiff's Remaining Arguments

Plaintiff next argues that the ALJ erred in (1) evaluating Plaintiff's credibility; and, (2) failing to consider the combined effect of Plaintiff's impairments (noting his complaints of fatigue, anxiety, memory loss, and inability to concentrate). However, because a reevaluation of

-20-

Dr. Rajhans' opinion may implicate other aspects of the ALJ's analysis – including Plaintiff's RFC and a possible finding of disability – this Magistrate Judge need not address these arguments.[16]

## IV.    CONCLUSION

Because the ALJ erred in evaluating the opinion of Plaintiff's treating psychiatrist, this Magistrate Judge **RECOMMENDS** that Plaintiff's motion for summary judgment be **GRANTED**, Defendant's motion for summary judgment be **DENIED**, and the case be **REMANDED** to the Commissioner for further proceedings consistent with this Report and Recommendation, pursuant to sentence four of 42 U.S.C. § 405(g).

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *See Willis v. Sec'y of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D.

---

[16] Plaintiff also states at the start of his motion that the ALJ failed to sustain his burden of establishing that there is other work in the national economy that Plaintiff can perform. Although he mentions it again cursorily in his discussion of the ALJ's treatment of Dr. Rajhans' opinion, this argument lacks any clear substantiation. As such, it should be waived. *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir.1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in a most skeletal way, leaving the court to . . . put flesh on its bones.").

Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be no more than 20 pages in length unless, by motion and order, the page limit is extended by the court. The response shall address each issue contained within the objections specifically and in the same order raised.

s/Mark A. Randon
Mark A. Randon
United States Magistrate Judge

Dated:  January 29, 2014

*Certificate of Service*

*I hereby certify that a copy of the foregoing document was mailed to the parties of record on this date, January 29, 2014, by electronic and/or ordinary mail.*

*s/Eddrey Butts*
*Case Manager for Magistrate Judge Mark A. Randon*
